In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-2173, 10-2176, 10-2355,
    11-1024 & 11-1510

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KEITH L. WALKER, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 2:08-cr-197—**J.P. Stadtmueller**, *Judge*.

ARGUED NOVEMBER 30, 2011—DECIDED JULY 3, 2013

Before MANION, WILLIAMS, and TINDER, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Joshua Carroll, Andrew Goetzke, David Knuth, Valerie Luszak, and Jeffrey Topczewski died after using heroin distributed by a large-scale narcotics trafficking organization. The five defendants in this case each pled guilty to possession with intent to distribute and conspiracy to distribute in excess of one kilogram of heroin in violation of 21 U.S.C. §§ 841(a)(1),

846. Because five people died, the government requested that the district court impose a mandatory minimum penalty of twenty years' imprisonment to each defendant's sentence under 21 U.S.C. § 841(b)(1)(A). The district court thought that it was required to impose the same penalty on all of the defendants under a theory of strict liability. So the major issue we need to decide on appeal is whether each of the defendants must receive the same statutory penalty, regardless of their role in the conspiracy or connection to the drugs that killed the users.

We now agree with the Sixth Circuit that a district court must make specific factual findings to determine whether each defendant's relevant conduct encompasses the distribution chain that caused a victim's death before applying the twenty-year penalty. And we affirm the sentences of Jean Lawler, Jason Lund, and Jermaine Stewart since the court found that they were in the distribution chain that led to the five deaths and the record clearly supports those findings. However, we vacate the sentences of Keith Walker and Eneal Gladney, and remand for further proceedings because the district court did not make the required findings.

## I.  BACKGROUND

The conspiracy charged here ran from 2005 to 2008 and operated in and around Milwaukee, Wisconsin, with Lonnie Johnson acting as one of its leaders and supplying bulk quantities of heroin. Stewart was Johnson's chief

lieutenant, managing regional operations after Johnson relocated to Chicago. Johnson and Stewart used a network of distributors in Milwaukee and Waukesha to coordinate sales for the organization. Walker and Gladney worked out of Milwaukee as higher-level distributors. The conspiracy's distributors partnered with lower-level street dealers and individual users who brokered further sales to customers.

A substantial portion of the conspiracy's customer base came from Pewaukee, Muskego, and Waukesha—areas west of Milwaukee. Lund worked out of the Waukesha branch as a dealer, connecting potential customers to Stewart and another distributor, Luke Bandkowski. Lawler was a low-level member of the conspiracy, also based in the Waukesha area. She purchased relatively small quantities of heroin from Bandkowski to resell to others and for personal use. The five individuals identified earlier died from using heroin distributed by this organization and four of these deaths occurred in the Waukesha area.

Between 2007 and 2008, the government worked with confidential informants to infiltrate the conspiracy and obtain evidence of its operations. On July 22, 2008, a grand jury returned a one-count indictment charging the defendants with conspiracy to distribute heroin. The indictment further alleged that death and serious bodily injury resulted from the use of heroin distributed by the conspiracy. Each of the appellants entered into plea agreements with the government reserving the right to

challenge the sentencing penalty for death or serious injury.

The district court found that Lund had coordinated the sales of heroin that killed two victims: Andrew Goetzke and David Knuth. Goetzke began using heroin in early 2007, buying drugs from the conspiracy through Bandkowski. He was eventually interviewed by police officers and agreed to become a confidential informant. On the night of June 5, 2008, Lund called his ex-girlfriend, Candice Haid, to get her help in coordinating Goetzke's purchase of heroin from Stewart. Lund and Stewart had a prior falling out and were not communicating directly, so Lund got Stewart's current phone number from Haid. Lund and Goetzke drove together to pick up heroin from Stewart's apartment in Milwaukee. The two split the drugs and Lund received an additional thirty dollar cut for setting up the sale. After they injected the heroin, Goetzke left for his mother's apartment with his girlfriend. The next morning, his mother was unable to wake him and called 911, but emergency personnel could not revive him.

One month later, on the night of July 3, 2008, Lund again contacted Stewart to coordinate a sale for himself, Haid, and David Knuth. After completing the purchase, the three began injecting heroin in a car. Knuth stopped breathing almost immediately. Haid was initially able to revive Knuth using cardiopulmonary resuscitation (CPR) and the three started driving home. But Knuth lapsed into unconsciousness and began bleeding from

the nose. Haid called 911 while Lund drove to the parking lot of a local healthcare facility. The dispatcher advised that Knuth be moved to a flat surface. So Haid pulled him onto the ground of the parking lot where she administered CPR. Lund drove off. Unfortunately the clinic was closed and Knuth could not be revived by emergency personnel when they finally responded. He was later pronounced dead.

The district court further found that Lawler sold the drugs that killed Jeffrey Topczewski. Jeffrey's sister, Jennifer Topczewski, is a co-defendant in the case and the siblings shared a severe addiction to heroin. On February 17, 2008, Jeffrey talked to his sister about using a recent tax refund to buy heroin. He contacted his sister to get the phone number for Lawler who had sold him drugs a few days earlier. At the time, Jeffrey was living with his parents and used their home phone since he did not have a cell phone. On February 19, 2008, the day before his death, Jeffrey called Lawler from his parents' home phone to set up a purchase. When Jeffrey did not arrive at the agreed time, Lawler called the Topczewski residence that evening to check on his status. Shortly thereafter, Jeffrey went to her house to complete the sale. Telephone records corroborate this series of events and confirm that the only calls from the Topczewski residence were to Jennifer and to Lawler while Jeffrey was home on the 19th. After taking heroin that evening, Jeffrey told his parents he felt sick. The next day, Jeffrey's mother checked his room in the evening and found him dead. In later interviews with

police, Jennifer Topczewski and Lawler's friend, Kallie Klappa, eventually confirmed that on the night of February 19th Lawler sold Jeffrey the heroin that killed him.

In addition, two others died from drugs sold by different participants in the conspiracy. The first was Valerie Luszak, a woman in Milwaukee who died on August 26, 2007. That night, she went to the house of a friend, Louis Brown, and offered to share her heroin with him. Brown could identify the heroin as that sold by the conspiracy due to distinctive ways in which the drugs were packaged. He also knew that Johnson, the conspiracy's leader, was Luszak's principal source. After shooting up, Brown warned Luszak about the strength and purity of the dose. But Luszak believed she had built up sufficient tolerance and injected the drug any-way. She fell unconscious and died several hours later. On December 29, 2007, Joshua Carroll set up a purchase of heroin from Bandkowski. Another user informed police that he and Carroll drove with Bandkowski to Milwaukee to collect the drugs that evening. Later that night, emergency personnel were called to Carroll's residence after he was found unresponsive. He could not be revived and was pronounced dead.[1]

The district court found that all five deaths had resulted from heroin distributed by the conspiracy and applied

---

[1] The district court adopted the factual findings in the PSR as its findings of fact at sentencing.

a twenty-year mandatory minimum sentencing penalty to each of the defendants under 21 U.S.C. § 841(b)(1)(A), but the sentences for four of the five appellants were adjusted below twenty years pursuant to § 5K1.1 of the Sentencing Guidelines for substantial assistance provided to the government. Each defendant now appeals the district court's findings and application of the twenty-year penalty to their sentence.

## II.  ANALYSIS

We review the district court's legal determinations and interpretation of sentencing statutes de novo. *United States v. Hernandez*, 544 F.3d 743, 746 (7th Cir. 2008). The penalty provisions of § 841(b)(1)(A) outline sentencing factors which must be supported by a preponderance of the evidence. *United States v. Krieger*, 628 F.3d 857, 866-67. We will reverse the district court's factual findings only where there is a "definite and firm conviction that a mistake has been committed." *United States v. Bennett*, 461 F.3d 910, 912 (7th Cir. 2006).

### A.  Liability for Death Caused by Drug Use

Each of the defendants pled guilty to conspiracy to possess with intent to distribute and distribute in excess of one kilogram of heroin in violation of 21 U.S.C. §§ 841(a)(1), 846. Section 846 specifically provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the

same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Section 841(b)(1)(A) increases the penalty when a drug user dies and instructs that a defendant's term of imprisonment "shall not be less than 20 years . . . if death or serious bodily injury results from the use of such substance" distributed in violation of § 841(a)(1). 21 U.S.C. § 841(b)(1)(A).[2]

The conspiracy charged in this case was a broad, multi-level drug network and each defendant played a different role in the organization. But the district court interpreted the penalty provision of § 841(b)(1)(A) as setting an identical twenty-year mandatory floor for all members of the conspiracy because the drug network, as a whole, had caused the deaths of several customers. Although the district court appeared troubled by these sentencing implications, it concluded that Congress intended that all defendants be held strictly liable for deaths caused by illegal drug distribution, regardless of their role in the distribution chain. The defendants argue that this was error and urge that we interpret § 841(b)(1)(A) as requiring a district court to find death or serious bodily injury reasonably foreseeable to a defendant before imposing this statutory en-

---

[2]  U.S.S.G. § 2D1.1(a)(2) mirrors the language in § 841(b)(1)(A) and assigns a base offense level of 38 "if the defendant is convicted under 21 U.S.C. § 841(b)(1)(A) . . . [and] death or seriously bodily injury resulted from the use of the substance. . . ." U.S.S.G. § 2D1.1(a)(2).

hancement. This issue is a matter of first impression in this circuit.

Almost every other circuit to consider the penalty under § 841(b)(1)(A) has held that a victim's death need not be reasonably foreseeable for the penalty to apply in cases where the defendant either directly produces, distributes, or uses an intermediary to distribute, fatal doses of drugs. *See United States v. Webb*, 655 F.3d 1238 (11th Cir. 2011); *United States v. De La Cruz*, 514 F.3d 121 (1st Cir. 2008); *United States v. Houston*, 406 F.3d 1121 (9th Cir. 2005); *United States v. Soler*, 275 F.3d 146 (1st Cir. 2001); *United States v. McIntosh*, 236 F.3d 968 (8th Cir. 2001); *United States v. Robinson*, 167 F.3d 824 (3d Cir. 1999); *United States v. Patterson*, 38 F.3d 139 (4th Cir. 1994). By its very terms, the statutory language of § 841(b)(1)(A) omits any reference to the mental state that would trigger the penalty. It simply applies whenever "death . . . results" from the use of drugs supplied by the defendant. The First and Eighth Circuits have described a defendant's liability under this provision as "strict," meaning that once a causal connection has been established, a defendant is automatically liable for the increased penalty regardless of whether or not he knew, or should have known, that a drug user might die. *See Soler*, 275 F.3d at 152; *McIntosh*, 236 F.3d at 974. *Cf. United States v. Burrage*, 687 F.3d 1015 (8th Cir. 2012) (affirming district court's use of "contributing cause" language in jury instructions where a drug dealer sold heroin to a user who later died with cocktail of various drugs found in his system), *cert. granted*, ___ S. Ct. ___, 2013 WL 1788076

(U.S. April 29, 2013) (granting certiorari to consider the question of whether § 841 is a strict liability crime without a foreseeability or proximate cause requirement). In the Fourth Circuit's view, "[t]he statute puts drug dealers on clear notice that their sentences will be enhanced if people die from using the drugs they distribute." *Patterson*, 38 F.3d at 145.

In contrast, the Ninth Circuit "stop[ped] short of ascribing to the . . . 'strict liability' language" used by other circuits, concluding instead that "[p]roof that the resulting death was actually caused by ingestion of the controlled substance knowingly distributed by the defendant is sufficient to increase the punishment for the unlawful distribution." *Houston*, 406 F.3d at 1124 n.5. The court recognized that "there may be some fact scenarios in which the distribution of a controlled substance is so removed and attenuated from the resulting death that criminal liability could not be imposed . . . ." *Id.*

The Sixth Circuit confronted such a scenario in *United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000), in evaluating the application of the twenty-year penalty to low-level conspirators who played no direct part in the underlying conduct which resulted in a drug user's death. In *Swiney*, a victim died after taking heroin sold by a multi-level drug conspiracy and the government claimed that all of the defendants should receive the same twenty-year minimum penalty. But the Sixth Circuit rejected the strict liability approach advocated by the government. The *Swiney* court began its analysis by finding that

the government's argument "ignores the Sentencing Guideline's treatment of conspiracy." 203 F.3d at 402 (citing § 1B1.3(a)(1)(B)). Section 1B1.3(a)(1)(B) of the Sentencing Guidelines outlines different sentencing consequences for different defendants "in the case of a jointly undertaken criminal activity." Application Note 2 further explains this now-familiar concept:

> In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:
>
> A.  in furtherance of the jointly undertaken criminal activity; and
>
> B.  reasonably foreseeable in connection with that criminal activity.
>
> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agree-

ment). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

*Id.* cmt. n.2. The Guidelines make clear that the scope of a defendant's relevant conduct for determining sentencing liability may be narrower than the scope of criminal liability. So in applying the principles of relevant conduct as defined in § 1B1.3(a)(1)(B), the Sixth Circuit in *Swiney* held that "before any of the [co-conspirators] can be subject to the twenty-year sentence enhancement of 21 U.S.C. § 841(b)(1)(C)" a "district court must find that [a given defendant] is part of the distribution chain" that led to an individual's death. 203 F.3d at 406. We read this to mean a defendant can only be subject to the enhancement if the distribution of heroin that ultimately led to a victim's death was "reasonably foreseeable" and in furtherance of jointly undertaken activity as defined in § 1B1.3(a)(1)(B).

We have already applied the logic of *Swiney* in a parallel context: mandatory minimums for drug quantities trafficked by a conspiracy. In that context, we have found that a defendant is only liable for the foreseeable

quantities of drugs attributed to co-conspirators. *See, e.g.*, *United States v. Alvarado-Tizoc*, 656 F.3d 740, 744 (7th Cir. 2011); *Gray-Bey v. United States*, 156 F.3d 733, 740-41 (7th Cir. 1998), *United States v. Edwards*, 945 F.2d 1387, 1395 (7th Cir. 1991). In other words, "the foreseeability analysis employed in the Guidelines context is also applicable in the statutory context." *United States v. Young*, 997 F.2d 1204, 1210 (7th Cir. 1993), *superseded on separate grounds*, *United States v. Rivera*, 411 F.3d 864, 866 (7th Cir. 2005). As a result, we decline to hold defendants presumptively liable for quantities distributed by the entire conspiracy because "it would . . . be difficult to assume Congress intended to employ under the statute a sentencing scheme that is so completely at odds with the measured approach clearly required by the Guidelines." *Id.*; *see also United States v. Munoz-Cerna*, 47 F.3d 207, 210 (7th Cir. 1995) ("[A]lthough Congress has chosen to address sentencing policy issues through both statutes and sentencing guidelines, we ought not presume lightly that it intended that these two vehicles of its legislative will be at odds with each other."). As noted above, § 846 makes co-conspirators "subject to the same penalties" whether or not they directly distributed drugs to users. But this does not mean that every co-conspirator shares the same mandatory minimum sentence for the entire quantity of drugs distributed by the conspiracy, or for the deaths of every buyer. *See United States v. Martinez*, 987 F.2d 920, 924 (2d Cir. 1993) (explaining that "[s]ection 846 does not subject the defendant to liability for any crimes committed

by any other member of the conspiracy, regardless of the
defendant's knowledge about those crimes [because
such an approach] would . . . expand dangerously the
scope of conspiratorial culpability.").

As discussed in greater detail below, we join the con-
sensus reached by other circuits and conclude that a
district court generally need not find death reasonably
foreseeable for the mandatory minimum sentence to
apply in cases where a defendant directly distributes
drugs or uses intermediaries to distribute drugs that
result in death. But like the *Houston* court, we hesitate to
characterize this liability as absolutely "strict." And like
the *Swiney* court, we hold that a district court must
find the distribution chain that ultimately led to an indi-
vidual's death to be relevant conduct under § 1B1.3(a)(1)(B)
before a defendant can receive the twenty-year penalty.

1.  **Finding Walker and Gladney Liable for Deaths
    Caused by Co-Conspirators' Distribution of
    Heroin Was Error**

We begin by considering whether the district court
correctly imposed the statutory penalty on Walker and
Gladney—two street-level distributors—who did not
directly distribute drugs to the users who died or dis-
tribute drugs through intermediaries. At sentencing,
Walker and Gladney argued that the mandatory
minimum penalty did not apply to them because the
government failed to prove that the drug users' deaths
were reasonably foreseeable to them. The district court

expressed misgivings about the manner in which
§ 841(b)(1)(A) could be applied, but believed its hand
were tied, stating:

> [A]lthough [Gladney] perhaps did not in any one
> of these deaths personally deliver the heroin
> that ultimately was ingested by the decedents,
> the statute on its face makes it clear that anyone
> associated with the conspiracy and the conduct
> that underlies it during the relevant time period
> is strictly liable and accountable for sentencing
> purposes for death.

But we cannot conclude that the application of the
penalty to Walker and Gladney was supported by
this record.

The government maintains that when a victim dies
from using drugs distributed by a conspiracy, all co-
conspirators are subject to the twenty-year mandatory
minimum penalty under *Pinkerton v. United States*, 328
U.S. 640 (1946). The *Pinkerton* doctrine holds that a
member of a conspiracy can only be held liable for
the reasonably foreseeable crimes committed by his ac-
complices in the course of the conspiracy. *Id.* at 647-48.
The government argues that the *Pinkerton* doctrine was
intended to hold defendants liable for the substantive
*offenses* of their co-conspirators, not for the *consequences*
of their co-conspirators' actions. In this case, it is fore-
seeable that members of heroin distribution conspiracy
will sell heroin. Users died from heroin sold by members
of the conspiracy. Therefore, in the government's view,

every defendant must be held strictly liable for a death caused by any co-conspirator's sale of drugs. But the Sixth Circuit in *United States v. Swiney* dealt with a factual scenario nearly identical to our case and rejected the strict liability approach for defendants like Walker and Gladney.

*Swiney* highlighted an important distinction between a defendant's criminal *liability* for acts committed by others in furtherance of the conspiracy and the *sentencing consequences* for a particular defendant. Under § 1B1.3(a)(1)(B), sentencing liability is limited to "the scope of the specific conduct and objectives embraced by the defendant's agreement." As a result, the Sixth Circuit had "no difficulty in reconciling the mandatory minimum language of § 841(b)(1)(C) and § 1B1.3(a)(1)(B)," finding it "clear that the Sentencing Guidelines have modified the *Pinkerton* theory of liability so as to harmonize it with the Guidelines' goal of sentencing a defendant according to the 'seriousness of the actual conduct of the defendant and his accomplices.'" *Swiney*, 203 F.3d at 404-05 (quoting William W. Wilkins & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C.L. Rev. 495, 502 (1990)).

The government argues that death is always a foreseeable result of illegal drug distribution, but the resulting sentencing scheme for co-conspirators under § 841(b)(1)(A) would have far-reaching implications. Consider the circumstances in *United States v. McIntosh*, 236 F.3d 968 (7th Cir. 2001), where a young girl died

from ingesting methamphetamine residue retained on a coffee filter. In that case, the defendant did not directly provide the victim with the drug, but the district court applied the mandatory minimum sentence under § 841(b)(1)(A) because the defendant originally produced the drug. Under the government's approach here, not only would the individual who produced the methamphetamine receive the twenty-year minimum sentence, but *every* person connected with the conspiracy in any way—from the lowliest lookout on the corner to the boss—would all receive the same twenty-year penalty. Such a result is overly broad and not supported by the law in our view. A member of a multi-level drug network may be criminally liable for aiding the broader conspiracy, but a district court has to explain why the fatal heroin doses are among the drugs attributable to a defendant for relevant conduct purposes in sentencing. *See Swiney*, 203 F.3d at 404. This does not mean that a defendant has to foresee a particular drug transaction leading to a user's death, but mere participation in the overall conspiracy is not sufficient for relevant conduct purposes.

Notably, much of the circuit precedent on which the government relies explicitly distinguishes defendants like Walker and Gladney—whose sentences were enhanced based solely on the conduct of their co-conspirators—from those who either directly distributed (or used an intermediary to distribute) drugs that killed users. In *McIntosh*, the Eighth Circuit specifically noted that it was not faced

with a situation in which the government seeks
to vicariously enhance a defendant's sentence
based *solely* on the actions of a co-conspirator or co-
conspirators . . . . We find *Swiney's* reasoning
applicable only in those cases in which a conspir-
acy defendant played no direct part in manufac-
turing the drug or in immediately distributing
the drug that caused the death or serious bodily
injury. If the government seeks to enhance a con-
spiracy defendant's sentence, as it did in *Swiney*,
based *solely* on conduct of a co-conspirator, a
foreseeability analysis *may* be required in deter-
mining whether Congress intended, under § 846,
that the defendant be held accountable for the
conduct of a coconspirator.

236 F.3d at 974 (emphasis added); *see also United States v.
Carbajal*, 290 F.3d 277, 284 (5th Cir. 2002) ("The court in
*Swiney* . . . addressed a situation in which the
defendant played no direct role in distributing or manu-
facturing the drugs that allegedly caused the deaths.").

The circumstances of Walker and Gladney are equiv-
alent to *Swiney* and we adopt the reasoning of the Sixth
Circuit. Walker and Gladney do not dispute that they
distributed drugs as members of the conspiracy. But
the government offered no evidence that they had any
connection to manufacturing or distributing the fatal
doses of heroin that caused the five deaths, and the
district court failed to explain why the fatal doses
should count for relevant conduct. The government

contends that the district court *implicitly* found that the deaths fell within Walker's and Gladney's relevant conduct because the court stated that the two were "deeply" involved in the conspiracy. But the presentence report outlines different sentencing liability for these defendants vis-à-vis their superiors. As leaders, Johnson and Stewart were equally responsible for the total drugs distributed—between three and ten kilograms of heroin—but the quantities attributed to Walker and Gladney did not equal that amount. Walker was responsible for one to three kilograms of heroin, while Gladney distributed between 700 grams and 1 kilogram of heroin. Four of the five deaths occurred in Waukesha, but the district court made no findings about whether Walker and Gladney dealt drugs in that area or whether they should have reasonably foreseen their co-conspirators' distribution.[3] Furthermore, the record contains a diagram of the conspiracy from the initial request for a search warrant, which visually links the four Waukesha deaths to a distribution chain running from Johnson to Stewart, Lund, Bandkowski, and Lawler with no connection to Walker or Gladney. And Valerie Luszak, the one victim who died in Milwaukee, appears to have purchased heroin directly from Johnson.

---

[3] Gladney's defense counsel also objected to the admission of the autopsy report for Joshua Carroll since he died on December 30, 2007, and Gladney did not join the conspiracy until sometime in February 2008.

To be clear, the twenty-year sentencing enhancement may apply even if Walker and Gladney did not personally sell any of the fatal doses at any point in the distribution chain that ultimately reached the victims. Consider the following example: A gives drugs to B, B sells them to C, and C dies. D, a member of the overall drug conspiracy, may be subject to the twenty-year sentencing penalty even though she did not directly sell the fatal dose to C, but "the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake" under U.S.S.G. § 1B1.3(a)(1)(B) before the penalty is applied. Otherwise, we have no way to know whether a defendant is being sentenced on the basis of drugs that were distributed in furtherance of the conspiracy and that distribution was reasonably foreseeable, or whether a defendant is being sentenced strictly on the basis of his general participation in a conspiracy in which a drug user died.

In reaching this conclusion, we also have no doubt that in setting a twenty-year mandatory minimum sentence, Congress sought to emphasize the inherent dangers associated with distributing controlled substances and to severely penalize sellers. But the question of whether defendants will be subject to this twenty-year minimum sentence depends upon whether their relevant conduct encompasses the drugs linked to an individual's death. Because the district court did not explicitly make such a finding for Walker and Gladney, we vacate their sentences and remand for resentencing.

### 2.  Stewart Is Liable for Distribution of Heroin Through Intermediaries

We next consider whether the district court correctly applied the twenty-year penalty to Stewart, a leader of the conspiracy. The government offered extensive evidence that Stewart was working at the top of the organization, in partnership with its leader, Lonnie Johnson. Stewart was the principal contact and supplier for the conspiracy's distributors as well as many of its customers. Several of the government's confidential informants identified him as one of the heads of the organization.

Although the district court made no finding that Stewart directly sold the fatal doses of heroin that killed the victims, the government offered extensive evidence supporting the district court's finding that Stewart was the ultimate source of drugs that killed users. Goetzke and Knuth overdosed on drugs sold by Lund, who had obtained them from his regular supplier: Stewart. Stewart also gave another distributor, Bandkowski, the drugs that caused Carroll's death. Lawler was the last link in the chain that killed Topczewski, having resold to him a smaller quantity of heroin she had purchased from Bandkowski. At Stewart's sentencing, the court told the defendant, "Now, I appreciate you may not have been standing over Mr. Knuth when he took that final dose, but that is not what the law requires. The law simply tracks who provided the substance . . . ."

The district court correctly applied the sentencing enhancement to Stewart for victims who died using

heroin he had provided through intermediaries. As explained above, many of our sister circuits have considered cases involving defendants higher in the chain of distribution than the co-conspirators who gave fatal doses directly to victims. All these cases have held defendants liable for subsequent death caused by drugs resold through an intermediary. *See United States v. De La Cruz*, 514 F.3d. at 125-26 (defendant led conspiracy, dispensing drugs through intermediaries); *McIntosh*, 236 F.3d at 970 (defendant provided drugs to intermediary who later gave them to decedent without defendant's knowledge or authorization); *Robinson*, 167 F.3d at 826-27 (same).

This conclusion is no accident but the result of the legislative design of § 846. As the Second Circuit observed in *United States v. Martinez*, 987 F.2d 920, 925 (2d Cir. 1993):

> The legislative history of 21 U.S.C. § 846 reveals that the intent of Congress in enacting that section was to ensure that a defendant who is charged with only conspiracy not be in a better position for sentencing than one who is charged solely with possession of the same amount of narcotics.

*Id.* Under the same rationale, a kingpin who finances and controls a drug distribution operation cannot escape liability for the "death resulting" penalty simply because he never personally sold to customers.

In this case, it is clear that Stewart's actions and conduct led to the victims' deaths. He supplied his distributors and relied upon them to resell to end users. It was

certainly understood that recipients of drugs Stewart provided would resell, share, or otherwise offer the drugs to unknown or unauthorized users. *See Robinson*, 167 F.3d at 831 ("It was reasonably foreseeable to [the defendant] that [the intermediary] would deliver the drugs to someone else . . . ."). Like our sister circuits, we acknowledge that our analysis might differ if a defendant's participation in the chain of distribution is especially removed from a victim's resulting death, as in the cases of Walker and Gladney. In such cases, "a court might conclude that it would not be consistent with congressional intent to apply the mandatory 20-year minimum sentence." *Id*. at 831-32. But Stewart's case does not require us to weigh these concerns. The victims' deaths were directly caused by Stewart's criminal conduct; indeed, they were part of the ordinary course of business for the conspiracy *he* led. Therefore Stewart is liable for the deaths and we affirm the district court's application of the penalty to his sentence.

### 3. Lund and Lawler Are Liable for the Direct Distribution of Heroin Causing Death

Finally, we address the most straightforward application of the statute to Lund and Lawler who—while occupying relatively low-level roles in the organization as a whole—had perhaps the closest connection to the deaths of customers who used drugs distributed by the conspiracy. Lund purchased heroin for his own use

from Stewart, but also distributed larger quantities to customers and associates at the street level. Lawler was even further down in the distribution chain, purchasing small quantities from distributors primarily for herself while reselling some to friends. But whatever their role in the conspiracy, the district court found that both Lund and Lawler directly provided users with the doses that ended their lives. Lund coordinated the sales of heroin that killed Goetzke and Knuth, and Lawler sold the drugs that killed Topczewski.

There can be little doubt that Congress intended the mandatory minimum penalty to apply to Lund and Lawler for their direct distribution of deadly heroin doses to users. This penalty applies without regard for any special care the defendant took, the reputation for safety of the controlled substance, or the hypersensitivity of the victim because "risk is inherent in [a controlled substance,] . . . [and so] persons who distribute it do so at their peril." *Robinson*, 167 F.3d at 831. So we affirm the district court's application of the twenty-year penalty to Lund and Lawler. They also challenge the trial court's factual findings related to the deaths of certain users, but as discussed below, these challenges are without merit.

### a.  No Evidence of Withdrawal From Conspiracy by Lund

Lund contends that the district court erred in finding that he was still a member of the conspiracy when

Goetzke and Knuth died of overdoses. Lund argues that the mandatory minimum should not apply because the deaths occurred after he had withdrawn from the conspiracy following a dispute with Stewart.

"In order to withdraw from a conspiracy, a defendant must cease his activity in the conspiracy and take an affirmative act to defeat or disavow the conspiracy's purpose, either by making a full confession to the authorities or by communicating his withdrawal in a manner reasonably calculated to inform his co-conspirators." *United States v. Bullis*, 77 F.3d 1553, 1562 (7th Cir. 1996). Furthermore, we have noted that "[i]nactivity alone does not constitute withdrawal; to withdraw from a conspiracy, the defendant must terminate completely his active involvement in the conspiracy, as well as take affirmative steps to defeat or disavow the conspiracy's purpose." *United States v. Hargrove*, 508 F.3d 445, 449 (7th Cir. 2007) (internal quotation marks and citation omitted); *United States v. Wilson*, 134 F.3d 855, 863 (7th Cir. 1998) ("The withdrawal must be complete and in good faith.").

Lund says he and Stewart had a falling-out after Stewart swindled him on a sale of heroin in December 2007. Stewart allegedly drove off without giving Lund the full amount he had purchased. Lund responded by tricking Stewart in a later transaction, paying him less than the full amount due. After this incident Lund was imprisoned for five months on unrelated charges. When he was released, Stewart refused to contact or

work with Lund directly because of the dispute over the
prior sale and Lund contends that this rupture con-
stituted a break in his participation in the conspiracy.

The district court did not err in declining to deem
this disagreement an effective withdrawal. Soon after
Lund was released from jail, he coordinated sales of
heroin between the conspiracy and customers. In addi-
tion to more heroin, Lund received a cash cut of the
sale after referring Goetzke to Stewart. It may be true
that Stewart refused to speak with or take money
directly from Lund because of their falling-out. But this
does not represent a withdrawal. Lund never fully termi-
nated his involvement in the scheme but rather con-
tinued his active—if strained—participation.

Lund's counsel questioned how a conspirator can
legitimately extricate himself once an organization's
leadership has expelled him. But even if this disagree-
ment could be considered an expulsion, we need not
entertain the hypothetical here. Withdrawal requires
affirmative steps by a conspirator to defeat or disavow
the conspiracy. Lund never confessed to authorities or
provided any notice to coconspirators of his purported
withdrawal. To the contrary, Lund's efforts to contact
and work with Stewart indicate that he wanted back in
even as he continued to be held at arm's length. Even
after Goetzke's overdose, Lund continued to connect
new customers to the conspiracy, resulting in the death
of Knuth one month later, and so we affirm Lund's sen-
tence.

### b.  No Clear Error in Finding That Lawler Gave Fatal Doses to Topczewski

Lawler claims that the district court wrongly determined that she provided Jeffrey Topczewski with the heroin that killed him. In reaching its conclusion, the trial court relied in part on portions of a presentence report compiled from police interviews with Jeffrey Topczewski's sister Jennifer and a friend, Kallie Klappa. Lawler contends that Jennifer Topczewski and Klappa's accounts were inconsistent because initially they did not inculpate Lawler and they only implicated her in exchange for dramatic sentencing reductions from the government. Lawler also contends that the district court should not have solely relied on the representations in the presentence report without evaluating the witnesses' sworn in person testimony.

In addition to the testimony of Jennifer and Klappa, there are two independent sources of evidence that Lawler does not rebut. First, Lawler admitted that she was providing heroin to Jeffrey Topczewski a few days before his death. Second, telephone records corroborate that Lawler sold the fatal doses of heroin to Jeffrey the night before he died. These records show a call from Jeffrey's residence to Jennifer, followed by a call from his residence to Lawler. Later, Lawler dialed Jeffrey's home phone. This evidence corroborates the presentence report's account that Jeffrey asked Jennifer for Lawler's phone number to secure heroin that night. Lawler returned the call to complete the sale.

Lawler is correct that Jeffrey had other sources who could have given him heroin and that the telephone records are not conclusive proof of a drug sale. But the doubts Lawler raises do not rise to the level of clear error. The evidence in the record is sufficient to support a finding by preponderance of the evidence that the "death resulting" enhancement applies to Lawler. Therefore we affirm Lawler's sentence.

### B.  Stewart's Guilty Plea was Voluntary and his Sentence was Reasonable

Stewart challenges the voluntariness of his guilty plea as well as his 300-month sentence. Both challenges are without merit.

A guilty plea must be entered knowingly and voluntarily in order to be valid. To ensure that a guilty plea is knowing, Federal Rule of Criminal Procedure 11(b) requires that a district court "inform the defendant of, and determine that the defendant understands" the nature of the charge to which the plea is offered, the possible sentencing range, and the fact that, by pleading guilty, the defendant waives certain constitutional rights. In addition, a "court must address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement)." Fed. R. Crim. P. 11(b)(2).

Stewart's guilty plea was knowing and voluntary. Stewart signed a written plea agreement containing an

unambiguous factual stipulation encompassing the government's charges in the complaint. In the district court's Rule 11 colloquy, Stewart affirmed his understanding of the plea agreement, the factual stipulation, and the penalties he faced, as well as the government's charges against him.

Stewart further contends that the district court erred in calculating his guideline range by making him accountable for three to ten kilograms of heroin without holding an evidentiary hearing. This argument must also fail because the drug quantity did not play a part in the calculation of Stewart's base offense level. The presentence report calculated the offense level by applying the enhancement for drug distribution offenses resulting in death under § 2D1.1 of the Sentencing Guidelines. As discussed above, this enhancement applies to Stewart and there were no other errors in the district court's calculation of a guideline range from 360 years to life imprisonment. The district court appropriately weighed sentencing factors, arrived at a reasonable below-guideline sentence of 300 months, and we therefore affirm the district court's determination.

## III. CONCLUSION

For the reasons stated above, we VACATE the sentences of defendants Walker and Gladney and REMAND for the resentencing. We AFFIRM the sentences of each of the other defendants.