*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0146P (6th Cir.)
File Name: 04a0146p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
 *Plaintiff-Appellee,*

 v.                                    No. 02-3864

JAMES A. TRAFICANT, JR.,
 *Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00207—Lesley Brooks Wells, District Judge.

Argued: December 9, 2003

Decided and Filed: May 19, 2004

Before: COLE and CLAY, Circuit Judges; COLLIER,
District Judge.*

———————————

**COUNSEL**

**ARGUED:** Richard M. Kerger, KERGER & KERGER,
Toledo, Ohio, for Appellant. Frank J. Marine, UNITED

———————————

* The Honorable Curtis L. Collier, United States District Judge for the
Eastern District of Tennessee, sitting by designation.

1

---

STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Appellee. **ON BRIEF:** Richard M. Kerger, KERGER &
KERGER, Toledo, Ohio, Percy Squire, LAW OFFICE OF
PERCY SQUIRE CO., Columbus, Ohio, Lloyd Pierre-Louis,
LAW OFFICE OF LLOYD PIERRE-LOUIS, Columbus,
Ohio, for Appellant. Frank J. Marine, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., Craig S.
Morford, Matthew B. Kall, ASSISTANT UNITED STATES
ATTORNEYS, Cleveland, Ohio, for Appellee.

———————————

**OPINION**

———————————

R. GUY COLE, JR., Circuit Judge. James A. Traficant, Jr.,
a Member of the U.S. House of Representatives from 1985
until 2002, appeals his conviction and sentence for violating
federal anti-corruption statutes. On appeal, Traficant argues
that: (1) his sentencing by the district court, following his
expulsion from the House of Representatives, overrode his
Fifth Amendment protection against Double Jeopardy; and
(2) his jury was selected in a manner at odds with his Fifth
and Sixth Amendment rights because of the disproportionate
chance that the petit jury would lack residents of his
congressional district. For the following reasons, the
convictions and sentence are **AFFIRMED**.

## I. BACKGROUND

On May 4, 2001, a federal grand jury returned a ten-count
indictment against then-Congressman Traficant, charging that
he violated the federal bribery statute, conspired to violate the
federal gratuity statute, accepted an illegal gratuity, obstructed
justice, conspired to defraud the United States, filed false tax
returns, and conducted the affairs of an enterprise through a
pattern of racketeering activity. A superseding indictment
was returned on October 26, 2001.

The jury for Traficant's case, set to be tried in the Eastern Division of the United States District Court for the Northern District of Ohio, was chosen according to that court's Jury Selection Plan ("the Plan"). For purposes of jury selection, the Plan assigns to each of the Eastern Division's three courthouses—which are located, respectively, in Cleveland, Akron and Youngstown—a discrete set of counties, whose eligible residents constitute the prospective jurors for its designated courthouse. The judge for each case is drawn at random, but the number of judges at each venue naturally affects the odds that a particular location will host the trial. When Traficant was indicted, there were six active judges sitting in Cleveland, but only one apiece in Akron and Youngstown. Although in Congress, Traficant represented Youngstown, his case was assigned to Cleveland, limiting his jury to residents of the Cleveland-designated counties, none of which Traficant represented.

The evidence at trial—throughout which Traficant served as his own lawyer—demonstrated, among other things, that while he was a congressman, Traficant demanded thousands of dollars in goods and services from businesses in return for official favors, including contacting the Director of the Federal Aviation Industry, the Secretary of State, and the King of Saudi Arabia; paid inflated salaries to his staffers, who were required to kickback the difference to their boss; and forced his congressional staffers to bale hay, repair plumbing, and reinforce barns at his show-horse farm. By a special verdict, a jury convicted Traficant on all counts.

Then Congress entered the fray. After holding hearings, the House Ethics Committee's Adjudicative Subcommittee concluded that the conduct underlying Traficant's convictions gave the committee a "substantial reason to believe" that Traficant had also violated three clauses of the House Code of Official Conduct. These clauses require that a House member: "[s]hall conduct himself at all times in a manner that shall reflect creditably on the House" (Clause One); "shall adhere to the spirit and the letter of the Rules of the House

and to the rules of duly constituted committees thereof" (Clause Two); and "may not receive compensation and may not permit compensation to accrue to his beneficial interest from any source, the receipt of which would occur by virtue of influence improperly exerted from his position in Congress" (Clause Three). *See* H.R. Con. Res. 5, 107th Cong. (2001), at Rule 23. On July 24, 2002, the full House of Representatives voted to expel Traficant.

Six days later, the district court sentenced Traficant (who by this point, had retained counsel) to eight years in prison, three years of supervised release, and $150,000 in fines. Traficant timely appealed.

## II. ANALYSIS

### A. Double Jeopardy

Traficant contends that he was twice placed in jeopardy: first, when the House of Representatives initiated hearings that included the possibility of his imprisonment, *see Kilbourn v. Thompson*, 103 U.S. 168, 189 (1880) ("[T]he Constitution expressly empowers each House to punish its own members for disorderly behavior. We see no reason to doubt that this punishment may in a proper case be imprisonment."); and second, after Congress had already expelled him, when the district court ordered his imprisonment.

The Government contends that Traficant has waived this argument because he articulated a slightly different basis for this claim below than he did here. Before the district court, Traficant classified his expulsion from the House as a punishment "essentially criminal in character." Here, Traficant highlights that his purported violation of House Ethics Rules carried "the possibility of incarceration." Although the two arguments vary in their particulars, both maintain that his judicially imposed sentence violated double jeopardy and that jeopardy first attached when the House

commenced the disciplinary proceedings that led to his ejection from Congress. Because we allow defendants to refine their original arguments for the litigation's later stages, *see, e.g.*, *United States v. Miller*, 161 F.3d 977, 984 (6th Cir. 1998) (defendant's appeal of sentencing enhancement was preserved even though defense counsel failed to specifically request certain later-sought factual findings below), and because Traficant's overall double jeopardy argument parallels the one he made below, we will consider it.

### 1. Separation of Powers

Traficant's argument implicates the Constitution's separation of powers. Congress and the Executive have authority that in some cases may overlap: the Executive is responsible for enforcing the laws, *see* U.S. Const. Art. II, sec. 1 ("The executive Power shall be vested in a President of the United States of America."); § 3 (requiring the President to "take care that the Laws be faithfully executed"), and Congress is responsible for disciplining its own members, *see* U.S. Const. Art. I., sec. 5, cl. 2 ("Each House may ... punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a member."). Traficant contends that the Double Jeopardy Clause allowed either Congress or the Executive—but not both—to bring an action against him.

Traficant's argument—that the Double Jeopardy Clause applies across the branches—would implicate the Constitution's provision for the separation of powers. Classifying the imposition of congressional discipline as a "jeopardy" would mean that merely by punishing (or contemplating punishing) one of its members for conduct that also violates federal law, the Legislative Branch could restrain the Executive Branch from fulfilling its constitutional responsibility to enforce federal law. Notwithstanding "the Executive Branch[ 's] . . . exclusive authority and absolute discretion to decide whether to prosecute a case," *United States v. Nixon*, 418 U.S. 683, 693 (1974), Traficant's theory

would shield would-be felons—who just so happen to sit in Congress—from criminal prosecution by the Department of Justice. Congress's slap on the wrist, or even its mere contemplation of a slap on the wrist, would forever tie the Executive Branch's hands.

Conversely, under Traficant's argument, a representative's criminal prosecution by the Executive Branch would immunize that representative from discipline imposed by Congress. If the Double Jeopardy Clause enveloped this type of internal congressional housekeeping, the prior prosecution of a congressman might immunize him from expulsion, or even reprimand. Congress could be powerless to discipline the subset of representatives it would likely consider to be most deserving of reprimand or removal: those convicted of federal crimes. Such a result would flout both common sense and the Supreme Court's declaration in *Burton v. United States*, 202 U.S. 344, 369 (1906), that the Expulsion Clause's empowerment of Congress, and Congress alone, to discipline its members survives a legislator's criminal conviction.

Traficant argues, however, that other Supreme Court precedent demands his release. First, Traficant invokes *Grafton v. United States*, 206 U.S. 333 (1907), in which the Court held that the Double Jeopardy Clause barred a soldier's prosecution for homicide in the courts of the Philippines, at the time a territory of the United States, because the soldier had already been acquitted of the same charge by a military court-martial. But in *Grafton*, the Executive Branch prosecuted both cases; both the military and civilian prosecutions were under the President's ultimate control. Thus, under *Grafton*, the Executive Branch gets only one bite at the apple, which is all that the Executive has requested in Traficant's case.

Second, Traficant relies on *United States v. Dixon*, 509 U.S. 688, 699 (1993), in which a plurality of the court explained that "to say that Congress can punish [the refusal of a witness to testify before it] is not to say that a criminal court can

punish the same refusal *yet again*." (emphasis in original). The *Dixon* hypothetical addressed only Congress's own prerogative: to subpoena a witness to testify before a congressional hearing. If anything, *Dixon* quashes Traficant's reasoning, for the Executive Branch is barred from enforcing congressional contempt orders by separation of powers. *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 220-24 (1821).

Finally, at oral argument, Traficant relied on *Powell v. McCormack*, 395 U.S. 486 (1969). *Powell* sustained a congressman's constitutional challenge to the House's refusal to seat him following his reelection. The Court held that the explicit list of prerequisites to joining the House set forth by the Constitution in Article I, section 2, implicitly preempted Congress from imposing additional conditions, notwithstanding its power under Article I, sec. 5, cl.2 to "be the Judge of the Elections, Returns, and Qualifications of its own Members." In other words, the Court simply defined whether the Constitution affirmatively granted a certain power to a particular branch of government. Federal courts demarcate such boundaries routinely. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549 (1995) (Article I did not authorize Congress to criminalize possession of firearms near schools); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (Article II did not authorize President to federalize steel mills absent legislative authorization); *McConnell v. Federal Election Commission*, 124 S. Ct. 619, 707-08 (2003). (Article III did not authorize federal courts to evaluate constitutional challenge to provisions of campaign-finance legislation which caused plaintiff no concrete injury). That we inevitably must identify the outer perimeter of each branch's constitutional power does not mean that we may provide for one branch's intrusion into another's undisputed constitutional responsibilities.

Although Traficant contends that rejecting his argument would subject a federal legislator to imprisonment for the same conduct by both the courts and Congress, the latter's power to imprison its members is uncertain. The century-old

Supreme Court passage which Traficant believes affirms Congress's power to do so is dictum, *see Kilbourn, supra*, and the Supreme Court has never squarely held that Congress may imprison its own members. Even assuming that it can, Congress has not done so even once, dating back to the year 1787. A concern so speculative—perhaps illusory—cannot redefine the relationship among the three branches of government.

The Constitution functions as a coherent whole, not as a series of isolated and unrelated clauses, such that we cannot interpret one of its provisions to enfeeble another. *Cf. Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) (Eleventh Amendment immunity yields to enforcement of legislation enacted pursuant to the Fourteenth Amendment). Because it would thwart the constitutional separation of powers if Congress could shield its members from criminal prosecution by the Executive Branch, we cannot read the Double Jeopardy Clause to include Congress's disciplining its own members.

2.   When Jeopardy Attached

Assuming that congressional disciplinary proceedings could implicate the Double Jeopardy Clause, Traficant must do more than point to the attachment of two separate jeopardies. He must also demonstrate that the subject of his challenge—here, his sentencing by the district court—was "a successive criminal prosecution that placed [him] in jeopardy a *second* time." *Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 784 (1994) (emphasis added). From the perspective of the Double Jeopardy Clause, order matters. If jeopardy attached first from Traficant's criminal prosecution in the courts, then any impermissible second jeopardy would result only from the actions of Congress.

The Government argues that the first (and in its view, the only) time that Traficant was placed in jeopardy was when his federal judicial proceedings commenced. The Government is right: "[j]eopardy attaches when the jury is empaneled and

sworn." *Crist v. Bretz*, 437 U.S. 28, 29 (1978). Traficant's trial jury took its oath on February 13, 2002, whereas the House Ethics Committee began investigating Traficant only after he was convicted. This chronology suggests that to the extent Traficant had a viable double jeopardy claim, he should have challenged the proceedings conducted by Congress.

Traficant, however, argues that his trial and sentencing were distinct, such that his sentencing was a separate jeopardy that succeeded Congress's intervention. But in *Schiro v. Farley*, 510 U.S. 222, 230 (1994), the Supreme Court refused "to treat the sentencing phase of a single prosecution as a successive prosecution for purposes of the Double Jeopardy Clause." Thus, although the congressional proceedings predated certain phases of the judicial proceedings, Traficant's sentencing did not result in a "new and separate jeopardy." Ultimately, because the Double Jeopardy Clause aims at only the second jeopardy (and Traficant has not asked us for an injunction ordering his reinstatement to a seat in the House of Representatives), his prosecution and sentencing in the courts did not violate the Constitution.

## B.   *Jury Selection Process*

Traficant also contends that because residents of some Eastern Division counties were disproportionately more likely to adjudicate his guilt than were residents of other Eastern Division counties, the process used to select his jury violated the Fifth and Sixth Amendments. The Government argues that Traficant waived this claim at trial. Prior to trial, the district court informed both the Government and Traficant that they must file all pretrial motions by January 9, 2002. Traficant submitted his challenge to the jury's composition on January 14, 2002. Federal Rule of Criminal Procedure 12(f) treats as waived any motion filed by a defendant after a court-imposed motions' deadline, unless the court excuses the tardy filing for cause. The district court declined to excuse Traficant's tardiness, and we review its decision under an

abuse of discretion standard. *See United States v. Kincaide*, 145 F.3d 771, 778 (6th Cir. 1998).

Traficant argues that the district court should have considered his jury challenge because he missed the deadline by only a few days, invoked an important constitutional right, and represented himself. But our precedent dictates that neither the defendant's self-representation nor the constitutional nature of the filing requires the district court to overlook its tardiness. *See id.* Traficant maintains, however, that the right to a fair jury is different in kind, and overrides the filing deadline. In some sense, he is correct. "The Constitution requires that every effort be made to see to it that a defendant in a criminal case has not unknowingly relinquished the basic protections that the Framers thought indispensable to a fair trial," *Schneckloth v. Bustamonte*, 412 U.S. 218, 241-42 (1973), and among these "basic protections" is the right to a trial by jury. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 276 (1942). And of course, the basic protection of a right to trial by jury includes the right to a jury representing a fair-cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 526-31 (1975).

That said, Traficant had full opportunity to challenge the jury selection process in a timely fashion. Eight months separated Traficant's indictment and filing deadline, and the district court reminded Traficant of this deadline several times during this span. Moreover, when Traficant decided to represent himself, the district court warned him that doing so was risky, but Traficant told the court that "I understand the Rules of Criminal Procedure...[a]nd if I make a mistake, it's my fault." This might very well be a different case if the district court forced Traficant to make an on-the-spot decision about whether to object to his jury composition. *Cf. Walton v. Briley*, 361 F.3d 431, 433-34 (7th Cir. 2004). But given both the amount of time he had to challenge the jury, and the number of times that the district court reminded him of the deadline, the denial of Traficant's tardy motion was neither unlawful nor unfair.

### III.  CONCLUSION

For the preceding reasons, the convictions and sentence of the district court are **AFFIRMED**.