RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0073p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

　　　　　　　　　　　　*Plaintiff-Appellee*,

　　*v.*

WESLEY SCOTT HAMM (17-6383); ROBERT LEE SHIELDS (18-5121),

　　　　　　　　　　　　*Defendants-Appellants*.

> Nos. 17-6383/18-5121

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:16-cr-00085—Danny C. Reeves, District Judge.

Argued:  March 19, 2019

Decided and Filed:  March 6, 2020

Before:  BOGGS, GIBBONS, and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Michael M. Losavio, Louisville, Kentucky, for Appellant  in 17-6383.  Thomas C. Lyons, LAW OFFICES OF THOMAS C. LYONS, Lexington, Kentucky, for Appellant in 18-5121.  Francesco Valentini, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Michael M. Losavio, Louisville, Kentucky, for Appellant  in 17-6383.  Thomas C. Lyons, LAW OFFICES OF THOMAS C. LYONS, Lexington, Kentucky, for Appellant in 18-5121.  Francesco Valentini, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Gary Todd Bradbury, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

—————————————

**OPINION**

—————————————

BOGGS, Circuit Judge.   By the summer of 2016, Wesley Hamm had already been addicted to opioids for a decade and, as his tolerance grew, he settled into a new routine.   Each day, he made the two-hour drive from his hometown of Mt. Sterling, Kentucky to Cincinnati, where he typically bought several grams of fentanyl.   When he returned to Mt. Sterling, he and his wife used some of the drug themselves and gave the rest to their roommate, Tracey Myers, a local drug dealer.   Myers diluted, divided, and sold her share.

Late that August, Hamm found a new Cincinnati supplier: Robert Shields.   Myers advertised Shields's offerings to one of her customers.   A few hours after Hamm returned from a visit to Shields and gave Myers her usual share, Myers sold three small packets of opioids to a man we will call L.K.W.   Later that night, L.K.W. died of an overdose.   Police officers quickly traced L.K.W.'s drugs back to Myers, and they arrested her and Hamm.

The story did not end there.   After her arrest, Myers smuggled her remaining drugs into the county jail.   She gave them to three of her cellmates, who soon lost consciousness. Paramedics arrived quickly enough that all three women survived.   Myers died by suicide a week later.

In the aftermath, a jury convicted Hamm and Shields of one count of conspiracy to distribute controlled substances and two counts of distributing carfentanil.   *See* 21 U.S.C. §§ 841(a)(1), 846.   On the latter two counts, the jury applied a statutory sentencing enhancement for distribution resulting in death or serious bodily injury.   *See id.* § 841(b)(1)(C). This triggered a mandatory minimum sentence of twenty years for Hamm and a mandatory life sentence for Shields (who had a prior felony drug conviction).

On appeal, Hamm and Shields challenge the jury instructions on the § 841(b)(1)(C) sentencing enhancement, a remark in the prosecutor's closing argument, and the sufficiency of the evidence on all counts.   While the evidence is sufficient to sustain their convictions and the prosecutor's remark was not prejudicial, the jury instructions on the sentencing enhancement

misstated the law. We therefore affirm Hamm and Shields's convictions, vacate their sentences, and remand for a new trial solely on the question of whether to apply § 841(b)(1)(C)'s sentencing enhancement on the distribution counts.

## I. Background

The record does not reveal how Hamm and Shields met, but their first transaction happened around August 22, 2016. By this time, Hamm (sometimes accompanied by Myers or Hamm's wife Jennifer[1]) was already making daily trips to Cincinnati to buy fentanyl from another supplier. Hamm, his wife, and Myers were impressed by what Shields was selling. Myers told customers that Shields's drugs were "supposed to be 1000000 times better than what we was getting," and one of the customers responded to Myers that Hamm had said the new drugs were "the best [he] ha[d] ever done." The Hamms also told a former supplier that they were no longer interested in his inferior offerings.

The next Hamm–Shields transaction happened on August 24. The Hamms and Myers had run out of drugs, and Myers was turning prospective buyers away. At 8:30 that morning, Hamm texted Shields to inform him:

> I am completely dry. Got Nada, zip, nothing. Need to get wit ya . . . . Call me when you get this so I know whether or not I need to make other arrangements, which might I add, I'm not trying to do. People already loving the shit outta this stuff.

Hamm and Shields spoke on the phone, and Hamm and his wife recruited a friend to drive them to Cincinnati. Myers stayed in Mt. Sterling, telling her customers to wait for the Hamms to return. Early in the afternoon, Hamm and Shields met, and Hamm bought four or five grams of what he thought was fentanyl.

On the way back to Mt. Sterling, the Hamms' friend sampled the purchase. As cell-phone videos show, he became distressed, incoherent, and unresponsive; Jennifer believed he was overdosing. The Hamms drove their friend to a hospital, but after they arrived at the hospital, they decided to take him back to Mt. Sterling instead of taking him inside.

---

[1]For the sake of clarity, we refer to Jennifer Hamm as Jennifer; and Wesley Hamm simply as Hamm.

When they got home, Hamm kept some of the drugs and gave the rest to Myers. That evening, Myers sold drugs to L.K.W. The purchaser and his girlfriend were regular heroin users, and Myers was their only dealer. Myers sold L.K.W. three small packets, which his girlfriend thought contained "low grade heroin." L.K.W. and his girlfriend each took a dose, and they gave the third packet to a friend.

After taking the drugs, L.K.W.'s girlfriend immediately "started feeling tingly all over . . . and then started losing [her] hearing." A minute later, she "passed out," and she was unconscious for three to four hours. When she woke up, she found L.K.W. "knelt down . . . beside the bed with his hand on [her] stomach . . . and his head was laying down." She "picked his head up, and blood just poured out of his nose." She called 911. A police officer was the first to arrive. He gave L.K.W. naloxone, a medication that can temporarily reverse the effects of an opioid overdose. This had no effect.

When paramedics arrived, L.K.W. was "lying [on] the floor unresponsive, not breathing, no pulse . . . no sign of life." They tried CPR, chest compressions, a breathing tube, and epinephrine, but "[n]othing would work," and he gave "[n]o response." L.K.W. never regained consciousness. Meanwhile, the friend who took the third packet was "in and out of consciousness," but survived.

The medical examiner later determined that L.K.W. died of "acute carfentanil and methamphetamine intoxication." Carfentanil, a synthetic opioid, is similar in action to other opioids like fentanyl and morphine (a major component in heroin) but it is much more potent. At trial, the medical examiner testified that carfentanil was about "10,000 times stronger than morphine."[2]

L.K.W's overdose was one of twelve in Montgomery County on the evening of August 24 and the early morning of August 25—an unprecedented number in such a short time. Local

---

[2]Potency is a measure of the dose of a drug necessary to achieve a particular effect. The more potent the drug, the lower the quantity needed to produce that effect. *Dorland's Illustrated Medical Dictionary* 1503 (32d ed. 2012). More potent opioids are "especially dangerous." Marc A. Schuckit & David S. Segal, *Opioid Drug Abuse and Dependence*, in 2 *Harrison's Principles of Internal Medicine* 2567 (Eugene Braunwald et al. eds., 2001).

police officers quickly traced L.K.W.'s drugs back to Myers.  Police arrested Myers for drug trafficking and Hamm on outstanding warrants on August 25.

Myers confessed to having sold what she thought was either heroin or fentanyl to L.K.W. the previous night.  Hamm admitted that he had bought what he believed to be fentanyl the day before, kept some for himself, and given the rest to Myers.  He identified Shields as his supplier and agreed to make several recorded calls to him.  The investigators had Hamm arrange a meeting with Shields for the next day, ostensibly to buy more drugs.  DEA agents arrested Shields when he arrived for the meeting on August 26.  Shields told the agents that he had recently sold about fifteen grams of fentanyl.

On August 27, three women overdosed in the Montgomery County Jail.  Myers was their cellmate, and she had smuggled her remaining drugs into the jail when she was arrested.  She had apparently given doses to her cellmates, and they lost consciousness soon after.

One of the women woke up about three hours later, but the other two did not.  When guards finally realized what had happened, they summoned paramedics, who administered naloxone and CPR.  One of the women had stopped breathing, had no pulse, and her face had even changed colors.  She also had a stroke.  According to the emergency-room doctor who treated them, the two women who did not wake up "probably would have died" if the paramedics had arrived any later.  All three of Myers' cellmates tested positive for carfentanil, which "present[ed] a substantial risk . . . of death," according to the government's toxicology expert.  Myers died by suicide a week later.

A grand jury indicted Shields, Hamm, and Jennifer.  Jennifer pled guilty to conspiracy to distribute controlled substances; she testified against her husband and Shields and received a 23-month sentence.  Shields and Hamm went to trial, and the jury convicted them on one count of conspiracy to distribute controlled substances (Count 1) and two counts of distributing carfentanil (Counts 2 and 3).  On the latter two counts, the jury applied statutory sentencing enhancements for drug distribution resulting in L.K.W.'s death (Count 2) and serious bodily injury to Myers's three cellmates (Count 3).  *See* 21 U.S.C. § 841(b)(1)(C).  The district court sentenced Hamm to 35 years in prison and Shields to life.

## II.  Sufficiency of the Evidence

Hamm and Shields challenge the sufficiency of the evidence on numerous grounds. We will address this issue first, as it determines whether there can be a retrial if their other arguments succeed.  *See United States v. Parkes*, 668 F.3d 295, 300 (6th Cir. 2012).  We hold that the evidence is sufficient to sustain Hamm's and Shields's convictions and the 21 U.S.C. § 841(b)(1)(C) sentencing enhancement.

In sufficiency-of-the-evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  It is the jury's job, not ours, "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Ibid.*

### A.  Existence of a Conspiracy (Count 1)

First, Hamm and Shields argue that there is insufficient evidence of a conspiracy.  In their view, the evidence shows only a buyer–seller relationship between the two of them, and not an agreement between them, Jennifer, and Tracey Myers.  We disagree.

To establish a 21 U.S.C. § 846 drug conspiracy, "the government must prove (1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy."  *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999). The agreement can be tacit, not formal, and the "government may meet its burden of proof through circumstantial evidence."  *Ibid*.  However, "[g]enerally, a buyer-seller relationship alone is insufficient to tie a buyer to a conspiracy."  *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009) (quoting *United States v. Cole*, 59 F. App'x 696, 699 (6th Cir. 2003)).  "The buy–sell transaction is simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction."  *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991).

Still, "this court has often upheld conspiracy convictions where there was additional evidence, beyond the mere purchase or sale," of a wider agreement. *Cole*, 59 F. App'x at 699–700. For instance, we have considered circumstantial evidence on the following factors to establish that "a drug sale is part of a larger drug conspiracy" including: "evidence of advanced planning"; multiple "transactions involving large quantities of drugs"; "repeat purchases . . . or other enduring arrangements"; "the length of the relationship"; "the established method of payment"; "the extent to which transactions are standardized"; and "the level of mutual trust between the buyer and the seller." *Deitz*, 577 F.3d at 680–81 (citations omitted).

Here, the evidence cuts both ways. There were only two transactions between Shields and Hamm, and the relationship was only a few days old when they were both arrested. On the other hand, the quantities involved were large. Jennifer testified that each transaction involved two to three grams of fentanyl. This estimate (the most conservative in the record) suggests that each sale yielded twenty to thirty doses. Also, the trips to Cincinnati required extensive planning carried out by phone calls and text messages. And Shields's involvement did not stop with the sales; he also offered to teach Hamm how to mix the drugs for resale.

Most importantly, there was evidence that the Mt. Sterling trio's relationship with Shields, while new, was meant to be exclusive and ongoing. Hamm told Shields he did not want to "make other arrangements," the Hamms declined an offer from a previous supplier once they started dealing with Shields, and Shields told Hamm, "I like to build relationships with my people . . . ."

A reasonable juror could have inferred from all of this that Shields had a tacit agreement with Hamm. The evidence that Jennifer and Myers joined this agreement is even stronger. Myers sometimes joined Hamm on his resupply trips, and Jennifer almost always did. Moreover, there was evidence that Hamm tried to control Myers's sales. In an August 23 text message to one of her customers, Myers explained, "I want ya to try the new shit but don't let [Hamm] know . . . Cause [Hamm] is trying to get rid of his" old supply first. And a message from the Hamms to their former supplier confirms that they worked as a unit with Myers: "This is [Jennifer] & [Hamm] . . . we got the straight fent . . . If U don't believe me or my husband and Tracey then ask someone that we deal with."

Thus, viewing the evidence in the light most favorable to the government, a reasonable juror could have found that Shields, Hamm, Jennifer, and Myers had an agreement to distribute opioids in Mt. Sterling. While it "is not totally implausible" that Hamm and Shields had only a buyer–seller relationship, "this was not the version of the events that the jury chose to accept," and the evidence is sufficient to support its verdict on Count 1. *United States v. Price*, 258 F.3d 539, 546 (6th Cir. 2001).

Hamm alone makes two additional arguments on the conspiracy count. Both are meritless. First, he contends that since his transactions with Shields occurred in Cincinnati, venue was improper in the Eastern District of Kentucky. Objections to improper venue generally "must be raised by pretrial motion," Fed. R. Crim. P. 12(b)(3)(A)(i). Hamm made no such motion. In any event, an offense that spans multiple districts may be "prosecuted in any district in which [it] was begun, continued, or completed." 18 U.S.C. § 3237(a). Second, Hamm points out that while the indictment charged him with conspiring to distribute carfentanil, fentanyl, and heroin, the government did not introduce any evidence that fentanyl and carfentanil are Schedule I or II controlled substances. But they unquestionably are, *see* 21 C.F.R. §§ 1308.11(b), 1308.12(c)(6), (9), and this was a question of law, not a factual issue for the jury to decide. *See, e.g.*, *United States v. Gonzales-Palma*, 645 F.2d 844, 846 (10th Cir. 1981).

## B. L.K.W.'s Cause of Death (Count 2)

Hamm and Shields also argue that there is insufficient evidence that L.K.W.'s "death . . . result[ed] from" carfentanil use, so they cannot be liable for the sentencing enhancement on Count 2. 21 U.S.C. § 841(b)(1)(C). This argument also fails.

To apply the enhancement, assuming that "use of the [carfentanil] [was] not an independently sufficient cause of [L.K.W.'s] death," the jury needed to conclude that carfentanil use was a but-for cause of L.K.W.'s death. *Burrage v. United States*, 571 U.S. 204, 218–19 (2014). When he died, L.K.W. had carfentanil in his blood at a concentration of 114 picograms per milliliter. The medical examiner, Dr. William Ralston, testified that L.K.W. died "[b]ecause of the carfentanil," and that had he not used carfentanil, "he would not have died at that time." Similarly, Michael Ward, the government's toxicology expert, opined that if L.K.W. "had not had

that level of carfentanil, I believe that he could have survived." *Id.* at 1133. A reasonable juror could have credited this testimony and concluded that carfentanil use was a but-for cause of L.K.W.'s death.[3]

It is true that L.K.W. also had methamphetamine in his blood, at a potentially fatal concentration of 213 nanograms per milliliter.[4] However, "[b]ut-for causation exists where use of the controlled substance 'combines with other factors to produce' death, and death would not have occurred 'without the incremental effect' of the controlled substance." *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (quoting *Burrage*, 571 U.S. at 211). A reasonable juror could have concluded that carfentanil and methamphetamine combined to cause L.K.W.'s death and that L.K.W.'s death would not have occurred without the marginal effect of the carfentanil. The testimonies from Ward and Ralston support that conclusion.

Hamm alone makes one other causation argument. He claims that he "was not the cause of death and injury to others as Tracey Myers was the one responsible for giving the toxic product to [L.K.W.] and others." Appellant Br. at 36. He seems to be importing a tort concept of proximate cause, arguing that Myers's intervening conduct breaks the chain of causation and cuts off his liability. But as we will discuss further below, a defendant may be convicted of distribution of controlled substances by virtue of being in a conspiracy with the perpetrator of the substantive distribution offense. To be liable for the § 841(b)(1)(C) enhancement after having been convicted on a conspiracy theory, the defendant need only have been part of the distribution chain of the drug at some point and need not have distributed the drug directly to the victim.

---

[3]Both Ralston and Ward also opined that L.K.W.'s carfentanil consumption was independently sufficient to cause his death. An independently sufficient cause is not quite the same thing as a but-for cause. *See* Antony Honoré and John Gardner, *Causation in the Law*, Stanford Encyclopedia of Philosophy (Winter 2010 ed.), https://plato.stanford.edu/archives/win2010/entries/causation-law/. In *Burrage*, the Supreme Court left open the question of whether the death-or-injury enhancement applies when drug use is an independently sufficient cause of death. 571 U.S. at 214–15. Because there is sufficient evidence that carfentanil use was a but-for cause of L.K.W.'s death, we need not address independently sufficient causation.

[4]Dr. Ralston testified that "[t]he methamphetamine is at a relatively low level, although, it too could potentially cause death." Ward explained that the concentration of methamphetamine in L.K.W.'s blood was "[t]oxic, without question," but whether it was "[l]ethal" depended on whether L.K.W. was "a first time user" and on "his health history." Another witness, Dr. Feola, testified that L.K.W.'s methamphetamine concentration was "in the low range" of the "spectrum" in which methamphetamine could cause death.

C.  Distribution to Myers (Counts 2 and 3)

Next, Hamm and Shields contend that there is insufficient evidence that the carfentanil Tracey Myers distributed to L.K.W. and her cellmates is the same substance Shields sold to Hamm in Cincinnati.  This argument fails, too.

As Hamm and Shields point out, there is some evidence that Myers had other suppliers. Jennifer Hamm testified that Myers sometimes bought her drugs from her own sources instead of going through the Hamms' Cincinnati contacts.  Myers also mixed her drugs with other substances; she did this in private in her room, and Jennifer Hamm never saw what substances, or in what quantities, Myers added.  Moreover, Myers's supply of carfentanil killed L.K.W., rendered L.K.W.'s girlfriend unconscious, and severely injured Myers's cellmates (who would have died without prompt medical treatment).  But the drugs that Shields sold to the Hamms did not cause the Hamms to overdose, and while the friend who went to Cincinnati with them had a bad reaction, he never lost consciousness and survived without any medical treatment.

Nevertheless, a reasonable juror could have traced Myers's carfentanil back to Hamm and Shields.  Consider the following: On the morning of August 24, Myers was out of drugs—we know this because she told L.K.W.  She also told L.K.W. in a text message that "[Hamm] is leaving to reup in an hour . . . I will text u when I get good."  About an hour later, L.K.W. made another inquiry.  Myers texted back, "No hun I dont have anything.  They just left to reup but will be back round 4 or so. . . . I will hollar at u when they get back and I get my shit ready for sell though."  That afternoon, Shields sold drugs to Hamm, and Hamm gave some of those drugs to Myers, who immediately prepared her share for resale.  That same evening, Myers sold the fatal carfentanil to L.K.W.  Finally, later that night or early the next morning, Myers was arrested and taken to the county jail, and she brought the carfentanil she gave her cellmates.  A reasonable juror could have inferred from this timeline and Myers's texts that she did not turn to any alternative suppliers.

That leaves the observation that the Hamms had no negative reaction to the drugs they bought from Shields.  A reasonable juror could have concluded that the Hamms sampled their purchase in small doses, or that they had developed a high tolerance from a long period of heavy

opioid use. For example, at trial, a DEA agent estimated an individual dose of fentanyl at one tenth of a gram, but Jennifer testified that her daily consumption ranged from 0.5 to 2 grams.

Hamm makes one other sufficiency argument regarding Counts 2 and 3. He claims that the government failed to prove that he knew the substance he distributed to Myers was carfentanil. But "the government need not 'prove mens rea as to the type . . . of the drugs.'" *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003) (quoting *United States v. Garcia*, 252 F.3d 838, 844 (6th Cir. 2001)). Hamm relies on cases involving "blind mules"—defendants who did not know (or claimed not to know) they were distributing drugs at all. There is no question that Hamm had "an intent to distribute a controlled substance[,]" which is all the government needed to prove.[5] *Ibid.*

### D. Unpreserved Sufficiency Arguments

"This court will not entertain a defendant's challenge to the sufficiency of the evidence on appeal unless the defendant moved for a judgment of acquittal under Rule 29 at the close of the government's case-in-chief and at the close of all the evidence." *United States v. Dandy*, 998 F.2d 1344, 1356 (6th Cir. 1993), as amended (Aug. 11, 1993). "Although specificity of grounds is not required in a Rule 29 motion, where a Rule 29 motion is made on specific grounds, all grounds not specified are waived . . . ." *Id.* at 1356–57 (internal citation omitted).

Hamm and Shields make several sufficiency arguments for the first time on appeal. They jointly contend that they are not liable for Myers's distribution of carfentanil to her cellmates because it was unforeseeable (or, alternatively, outside the scope of their agreement) that she would smuggle drugs into jail. Shields argues that Myers's distribution of carfentanil (rather than heroin or fentanyl) was also outside the scope of the conspiracy. Finally, Hamm argues that he had withdrawn from the conspiracy by the time Myers gave carfentanil to her cellmates. Because Hamm and Shields made Rule 29 motions on specific grounds at trial, and did not include the arguments that they now make on appeal, they forfeited these other arguments, and we will not consider them.

---

[5]In making his Rule 29 motion for a judgment of acquittal, Hamm's attorney conceded that Hamm "believed he was purchasing" fentanyl.

### III.  Closing Argument

Next, Hamm and Shields argue that the government stated facts not in evidence during its closing argument.  Because they did not object at the time, we review for plain error.  *See* Fed. R. Crim. P. 52(b).  We see none.

Ralph Charles, a Montgomery County Sheriff's Office detective, testified about three drug transactions involving Tracey Myers, including two controlled purchases by informants. These transactions were not the ones at issue in the case, and they did not involve Hamm or Shields.  They happened on August 4, August 18, and August 23.  In the aftermath, the police turned the drugs over to the DEA for laboratory tests.

Edward Erisman, a DEA chemist, testified that he tested three bags of drugs, detecting fentanyl, heroin, and carfentanil.  He explained that the bags came from the DEA's Lexington office, but he did not know where or from whom the Lexington office got them.  He said nothing to connect the drugs to Myers.

In its closing argument, the government linked Charles's and Erisman's testimony, stating:

> Law enforcement, our detectives from Montgomery County, were already on to Tracey Myers.  They knew she was involved in drug trafficking.  They had an active investigation.  They had bought from her very close in time.  August 18th they used an informant to purchase from Tracey.  A week or month later when the lab results were returned, they found that they had fentanyl from that transaction.
>
> August 23rd, in between the two trips [to Cincinnati], 8/22, 8/24. August 23rd make a controlled [buy] from Tracey, and it turns out it's carfentanil.  That stuff came from . . . Mr. Shields.

As Hamm and Shields point out, the government neglected to introduce any evidence that the drugs Erisman tested were the same ones the Montgomery County Sheriff's Office bought from Myers.  The closing argument therefore stated facts not in evidence.

But this does not require a new trial.  Because defense counsel did not object to the statement, Hamm and Shields must show that "the impropriety was flagrant and thus warrants reversal." *Cristini v. McKee*, 526 F.3d 888, 899 (6th Cir. 2008) (citation omitted).  They cannot

do so because the four factors we apply to improper prosecutorial statements weigh against a finding of plain error. The prosecutor's remark was "isolated"; there is no evidence it was "deliberate"; and it did not "prejudice the defendant[s]." *Ibid.* (citation omitted). To the contrary—the prosecutor's factual assertion linking Myers to the carfentanil is consistent with the defense's theory at trial, which was that Myers did distribute carfentanil to L.K.W. and her cellmates, but that she got it from another supplier, not Hamm and Shields. Thus, although the strength of "the evidence against the defendant[s]"—the fourth consideration in a flagrancy analysis, *ibid.* (citation omitted)—was arguably not great, there was no "clear" or "obvious" error that "affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993) (explaining the plain-error standard).

## IV.  Jury Instructions on the Sentencing Enhancement

Counts 2 and 3 charged Hamm and Shields with distributing carfentanil. The indictment also alleged that their carfentanil distribution "resulted in the overdose death of L.K.W." and in "serious bodily injury" to Myers's cellmates. This triggered a statutory sentencing enhancement (which we will usually call the death-or-injury enhancement), exposing Hamm to a 20-year mandatory minimum and Shields to a mandatory life sentence. *See* 21 U.S.C. § 841(b)(1)(C).

Hamm and Shields argue that the jury instructions misstated the law on this enhancement. In their view, the death-or-injury enhancement only applies to defendants who were "part of the distribution chain" to the overdose victim. *United States v. Swiney*, 203 F.3d 397, 406 (6th Cir. 2000). The jury instructions here omitted this limitation. Instead, they allowed the jury to apply the enhancement using *Pinkerton* liability, a much broader theory.

We hold that the jury could not use a *Pinkerton* theory to apply § 841(b)(1)(C)'s death-or-injury enhancement. *Swiney* governs the application of the enhancement, and the jury needed to find that Hamm and Shields were part of the chain of distribution to L.K.W. and Myers's cellmates. The jury instructions therefore misstated the law. Because the error was harmful, we vacate Hamm's and Shields's sentences and remand for a new trial solely on the applicability of the death-or-injury enhancement.

A.  Standard of Review

Ordinarily, we "review de novo a claim that a jury instruction improperly or inaccurately stated the law." *United States v. Lawrence*, 735 F.3d 385, 427 (6th Cir. 2013).  The government contends that Hamm and Shields failed to preserve their objection to the jury instructions, so we should instead review for plain error.  *See* Fed. R. Crim. P. 52(b).  We disagree.

To preserve the issue for appeal, Hamm and Shields needed to object to the jury instruction they now challenge and "inform[]" the district court of "the grounds for that objection."  Fed. R. Crim. P. 51(b).  They did object to the instruction that they now challenge. However, the basis for their objection at trial differed somewhat from their current arguments. Hamm and Shields argued below that it was improper to give any instruction on *Pinkerton* liability for Counts 2 and 3 because those "are distribution and not conspiracy counts."  They did not raise *Swiney* or propose an alternative instruction.  While we would urge counsel to raise their objections in future cases with greater alacrity and specificity, what Hamm and Shields did was (barely) sufficient to preserve the issue and the *Swiney* argument, for two reasons.

First, although Hamm and Shields make a somewhat different argument on appeal than they did in the district court, they "clearly challenged the application of" the enhancement in the district court.  *United States v. Butler*, 207 F.3d 839, 849 (6th Cir. 2000) (concurring opinion of Jones, J., for a majority of the court).  In the district court, they argued that Jury Instruction No. 17 was improper because *Pinkerton* has no application whatsoever to Counts 2 and 3.  Now, they argue that Jury Instruction No. 17 was improper because *Pinkerton* does not apply to the *sentencing enhancement* for Counts 2 and 3.  Criminal defendants are allowed "to refine their original arguments for the litigation's later stages," *United States v. Traficant*, 368 F.3d 646, 650 (6th Cir. 2004), and "[w]e have recognized a distinction between failing to properly raise a claim before the district court and failing to make an argument in support of that claim."  *Leonor v. Provident Life & Accident Co.*, 790 F.3d 682, 687 (6th Cir. 2015) (citation omitted).  Here, Hamm and Shields did raise their objection before the district court.

*Traficant* is an instructive comparison.  The defendant, a former Congressman charged with various forms of corruption, argued in the district court and on appeal "that his judicially

imposed sentence violated double jeopardy and that jeopardy first attached when the House commenced the disciplinary proceedings that led to his ejection from Congress."  368 F.3d at 650.  But he changed the basis for this argument.  In the district court, he claimed that the reason jeopardy attached during his Congressional disciplinary proceedings was that "his expulsion from the House [was] a punishment 'essentially criminal in character.'"  *Id.* at 649.  On appeal, he abandoned the expulsion argument, instead claiming that jeopardy attached during the Congressional proceedings because the House has the authority to imprison one of its members for violating ethics rules.  *Id.* at 649–50.  The government contended that the shift in rationales meant Traficant had forfeited his double-jeopardy claim.  We rejected the government's argument, holding that, while Traficant's trial and appellate arguments "var[ied] in their particulars," the difference was not so significant as to forfeit the argument on appeal.  *Id.* at 650.

Like the defendant in *Traficant*, Hamm and Shields have been consistent about their objection (Jury Instruction No. 17 should not have been given), and they have consistently argued that *Pinkerton* liability is inapplicable.  Changing their specific rationale—they no longer argue that *Pinkerton* is totally inapplicable to Counts 2 and 3 but argue only that it is inapplicable for purposes of applying the enhancement on those counts—is a permissible way of "refin[ing] their original arguments for the litigation's later stages."  *Ibid.*; *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 707 n.10 (2005) (holding that petitioner had preserved objection to jury instruction even though, in the district court, it had proposed a different replacement instruction than the one it proposed on appeal).

This court reached a similar result in *United States v. Miller*, 161 F.3d 977 (6th Cir. 1998).  *Miller* concerned a particular sentencing enhancement, the applicability of which turned on whether the defendant was a "manager or supervisor" of a conspiracy or instead was a "leader or organizer."  *Id.* at 984.  On appeal, the defendant argued that the district court erred by applying the enhancement without making a specific factual finding about which category she fell into.  *Ibid.*  The government claimed that the objection was not preserved.  We rejected this argument, reasoning that, while it was "true that Byrnes did not argue that she was a 'manager or supervisor' rather than an 'organizer or leader,' her counsel did object to *any* enhancement under" the relevant Guidelines provision.  *Ibid.*  "Therefore, the issue was preserved for appeal."

*Ibid.* Here, Hamm and Shields objected to any *Pinkerton* instruction, which was sufficient to preserve the issue.

Second, while "the general rule is that an appellate court will not entertain an argument based upon a theory not litigated below, an exception exists when a new argument presents a question of pure law." *City of Cleveland v. Ohio*, 508 F.3d 827, 849 (6th Cir. 2007) (internal alterations, citations, and quotations omitted) (first quoting *Hutton v. United States*, 501 F.2d 1055, 1062 (6th Cir. 1974) then quoting *Butler*, 207 F.3d at 850 (concurring opinion of Jones, J., for a majority of the court)).  "This exception is consistent with the rationale for why we generally do not entertain issues not raised below—that it is essential that parties have the opportunity to offer all the evidence they believe relevant to the issues." *Butler*, 207 F.3d at 850 (concurring opinion of Jones, J., for a majority of the court) (internal alterations and quotations omitted) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)).  "When a new argument presents a question of pure law, neither party has been denied the opportunity to offer relevant evidence in making its case," and "both sides have had a full opportunity to present whatever legal arguments they may have on this particular issue." *Ibid.* (internal quotations omitted) (quoting *Singleton*, 428 U.S. at 120).

Here, the "additional argument [Hamm and Shields] now make[] in support of" their objection to the *Pinkerton* instruction—which they preserved—"is one of pure law." *Id.* at 849. "The question is simply the proper interpretation and application of the relevant statute, requiring no new or amplified factual determination." *Ibid.* (cleaned up).  Consequently, "the fact that the [new] argument was not raised below is immaterial." *Ibid.*

For these reasons, we will review the jury instructions de novo.

## B.  Background

Ordinarily, distributing carfentanil carries a maximum sentence of 20 years in prison, with no mandatory minimum.  21 U.S.C. § 841(b)(1)(C).  But "if death or serious bodily injury results from the use of such substance," the statutory maximum rises to life imprisonment, with a mandatory minimum of 20 years.  *Ibid.*  And if the defendant has "a prior conviction for a felony drug offense," the death-or-injury enhancement results in a mandatory life sentence.  *Ibid.  See*

*generally Burrage*, 571 U.S. at 208–10 (describing the Controlled Substances Act's sentencing scheme and the legislative history of the death-or-injury enhancement).

Because the death-or-injury enhancement increases the minimum and maximum sentences, "it is an element that must be submitted to the jury and found beyond a reasonable doubt." *Id.* at 210. To comply with this obligation, the indictment alleged that the carfentanil distribution by Hamm and Shields "resulted in the overdose death of L.K.W." and "in serious bodily injury" to Tracey Myers's cellmates. Confusingly, though, the indictment and the jury instructions[6] conflated the two distribution counts, which are substantive offenses, and the death-or-injury enhancement, which is a separate sentencing provision, and they listed the sentencing provision as if it were an element of the substantive offense.[7]

Jury Instruction No. 17 explained that "[t]here are two ways that the government can prove the defendants guilty" of Counts 2 and 3 (and thus prove that the sentencing enhancement applies):

> The first is by convincing you that the defendant personally committed or participated in the crimes. The second is based on the legal rule that all members of a conspiracy are responsible for acts committed by the other members, as long as those acts are committed to help advance the conspiracy, and are within the reasonably foreseeable scope of the agreement . . . . In other words, under certain circumstances, the act of one conspirator may be treated as the act of all.

This second option comes from the *Pinkerton* doctrine.

*Pinkerton* liability is a way of holding members of a conspiracy liable "for acts committed by other members." Neal Kumar Katyal, *Conspiracy Theory*, 112 Yale L.J. 1307, 1336 (2003). In other words, it is a form of "collective guilt" or "vicarious liability." *Id.* at 1369, 1372. The doctrine holds that a member of a conspiracy is liable for "substantive offense[s]" committed by his co-conspirators, even if he did not participate in them, as long as: (1) the offenses are "done in furtherance of the conspiracy," (2) they "fall within the scope of the

---

[6]The jury instructions stated that "Counts 2 and 3 of the indictment accuse[ ] the defendants of committing the crimes of distribution of . . . carfentanil . . . resulting in death and serious bodily injury."

[7]Alternatively, one could view distribution of carfentanil as a lesser included offense of distribution resulting in death. *See Burrage*, 571 U.S. at 210 n.3. This makes no practical difference. The important thing is to distinguish between the death-or-injury enhancement and the underlying distribution charges.

unlawful project," and (3) they are reasonably foreseeable "consequence[s] of the unlawful agreement." *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946).

This is a very broad rule. It means, for example, that "[e]ach retailer in an extensive narcotics ring could be held accountable . . . [for] every sale of narcotics made by every other retailer in that vast conspiracy." 2 Wayne R. LaFave, *Substantive Criminal Law* § 13.3(a) (3d ed.) (footnote omitted). "The crimes themselves do not have to have been agreed upon, intended or even discussed" by the defendant for him to be liable. Paul Marcus, *Criminal Conspiracy Law: Time to Turn Back from an Ever Expanding, Ever More Troubling Area*, 1 Wm. & Mary Bill Rts. J. 1, 6 (1992).

### C. Applicability of *Pinkerton* to the Death-or-Injury Enhancement

Hamm and Shields argue that Jury Instruction No. 17 improperly allowed *Pinkerton* liability to trigger the § 841(b)(1)(C) death-or-injury enhancement. They contend that the enhancement applies only to defendants who were part of the distribution chain that placed the drugs into the hands of the overdose victim—a narrower rule than *Pinkerton*. We agree, and we therefore hold that Jury Instruction No. 17 misstated the law, because it did not specify that *Pinkerton* liability could only apply to the substantive offense, not the sentencing enhancement.

It is important at the outset to clarify what Hamm and Shields are *not* arguing. First, they do not challenge the accuracy of Instruction No. 17's description of the *Pinkerton* rule, which followed a pattern instruction. *See* Sixth Circuit Pattern Criminal Jury Instructions § 3.10 (Jan. 1, 2019). Second, they do not dispute that the jury could use *Pinkerton* to hold them liable, as Tracey Myers's co-conspirators, for her substantive offenses of distributing carfentanil to L.K.W. and to her cellmates. Their argument concerns only their liability for the death-or-injury sentencing enhancement.

That argument relies on our decision in *United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000). *Swiney* involved a conspiracy to distribute heroin. *Id.* at 400. One of its members sold heroin to a man who died of an overdose. *Ibid.* The nine defendants were co-conspirators who apparently had nothing to do with the sale to the overdose victim. *Id.* at 400–01. They "were convicted of conspiracy under 21 U.S.C. § 846," the general drug-conspiracy statute, and the

government asked the district court[8] to apply the § 841(b)(1)(C) death-or-injury enhancement. *Id.* at 401. The district court refused, finding "no proof linking the heroin which caused" the overdose victim's death to any of the nine defendants. *Ibid.* The government appealed the sentences. *Ibid.*

On appeal, the government argued that under *Pinkerton*, the nine defendants were liable for the death as co-conspirators of the dealer who sold the fatal dose. *Ibid.* The government contended that "it is reasonably foreseeable that someone will die after using heroin distributed by [a] conspiracy," so the sentencing enhancement should apply to every member. *Id.* at 402. We rejected the government's argument because "it fail[ed] to limit the *Pinkerton* theory of liability in the sentencing context." *Id.* at 405.

*Swiney* instead held that "before any of the Defendants can be subject to the sentence enhancement of 21 U.S.C. § 841(b)(1)(C) . . . , the [jury] must find that he or she is part of the distribution chain that le[d] to [the overdose victim's] death." *Id.* at 406; *see also United States v. Walker*, 721 F.3d 828, 833–36 (7th Cir. 2013) (adopting *Swiney*'s holding and reasoning), *vacated on other grounds*, 572 U.S. 1111 (2014).

*Swiney* relied mainly on the Sentencing Guidelines, which has led some subsequent panels of this court to view *Swiney* as a case about "sentencing under the Guidelines." *United States v. Watson*, 620 F. App'x 493, 509 (6th Cir. 2015). This is not quite right. *Swiney* was about the statutory § 841(b)(1)(C) enhancement, but we used the Guidelines' relevant-conduct provisions for conspiracy cases as a tool to interpret the statute. *Swiney*, 203 F.3d at 405–06. In doing this, we observed that "the Sentencing Guidelines have modified the *Pinkerton* theory of liability," adopting a narrower theory based on "the seriousness of the actual conduct of the defendant and his accomplices." *Id.* at 404 (quoting William W. Wilkins & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing* Guidelines, 41 S.C.L. Rev. 495, 503 (1990)).

---

[8]*Swiney* predates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Booker*, 543 U.S. 220 (2005). At the time, a district court could apply the death-or-injury enhancement; now a jury finding is required.

In short, *Swiney* drew a sharp distinction between guilt-stage liability for co-conspirators' substantive offenses, where *Pinkerton* has full force, and sentencing liability (under § 841(b)(1)(C) as well as the Guidelines) for co-conspirators' conduct, where *Pinkerton* has been narrowed. *Id.* at 405; *see Walker*, 721 F.3d at 835 ("[T]he scope of a defendant's relevant conduct for determining sentencing liability may be narrower than the scope of criminal liability.").

According to Hamm and Shields, *Swiney* controls this case. The jury needed to find that they were part of the distribution chain to L.K.W. and Myers's cellmates, and it could not use *Pinkerton* to enhance their sentences. The government responds that *Swiney* applies only when the death-or-injury enhancement is attached to a conviction for conspiracy. It contends that when the underlying conviction is for a substantive offense, like distribution, *Swiney*'s distribution-chain rule is irrelevant, and the jury remains free to use *Pinkerton* liability to enhance the sentence.

It is true that the *Swiney* defendants were convicted only of conspiracy, and not of distributing heroin. *Swiney*, 203 F.3d at 401. It is also true that the *Swiney* opinion framed the issue as when "a defendant convicted under 21 U.S.C. § 846," the drug-conspiracy statute, "is subject to the penalty set forth in 21 U.S.C. § 841(b)(1)(C)." *Id.* at 406. And *Swiney*'s reasoning focused on the Guidelines' treatment of relevant conduct in conspiracy cases. *Id.* at 402–04. Nevertheless, the government's attempt to limit *Swiney*'s reach to conspiracy convictions is unpersuasive.

First, the government's argument is at odds with the structure of Congress's sentencing scheme for drug crimes. The death-or-injury enhancement can raise the sentence for any offense under 21 U.S.C. § 841(a), and for attempt and conspiracy to commit any of those offenses.[9] Presumably, it should apply in the same way to every sentence it can enhance—Congress created

---

[9]The statutory scheme has three main parts. 21 U.S.C. § 841(a) defines the substantive drug crimes: manufacturing, distributing, and dispensing controlled substances, and possessing them with the intent to do one of those things. Section 846 makes it a crime to attempt or conspire to commit any of the § 841(a) crimes. Section 841(b) sets the sentences for all of the substantive crimes, and for attempt and conspiracy. The sentences can vary based on drug quantity and type, whether the defendant has prior felony drug convictions, and other factors, but they do not vary based on the specific type of crime under § 841(a) or § 846 the defendant committed.

one common sentencing scheme for many different drug offenses. *See* 21 U.S.C. § 841(b) (providing that "*any person who violates subsection (a)* of this section shall be sentenced as follows . . . ." (emphasis added)). And nothing in the statute suggests that the application of the death-or-injury enhancement varies based on the underlying conviction. *See id.* § 841(b)(1)(C) (distinguishing among Schedule I and II drugs and other kinds of controlled substances, but not among § 841(a) offenses). The government's argument departs from this structure, without statutory support.

Second, the government's argument is inconsistent with a specific provision of the drug-conspiracy statute. A person convicted of a drug-conspiracy offense is "subject to the same penalties as those prescribed for the [§ 841(a)] offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846. So, for sentencing purposes, there is no difference between a conviction for conspiracy and a conviction for distribution. The penalties are "the same." *Ibid.* So why would the death-or-injury enhancement—which is part of the penalty—apply differently in each case? Again, the government's position departs from the statute with little justification.

Third, although Hamm and Shields were convicted of substantive distribution counts, the sentencing enhancements on those counts were wholly subsidiary to the conspiracy count. No one is alleging that Hamm and Shields actually sold carfentanil to L.K.W. and the county-jail inmates; they are only liable for the distribution to L.K.W. and the inmates as Tracey Myers's co-conspirators. Thus, it makes little sense to say that *Swiney* is a conspiracy case but this one is not. Without the Count 1 conspiracy conviction, there could be no distribution conviction and therefore no sentencing enhancement on Counts 2 and 3. The government's argument rests on a distinction without a conceptual difference.

The government makes one final point: It argues that legislative history supports confining *Swiney* to § 846 conspiracy sentences. Congress enacted the death-or-injury enhancement before the Sentencing Commission created the first Guidelines, while it amended § 846 after the Guidelines came into effect. In the government's view, this means Congress acquiesced to the Guidelines' limitation of *Pinkerton* liability in conspiracy cases, but not in any other enhancement cases. Again, though, this argument is at odds with the statutory structure.

Congress created one drug-sentencing scheme, not separate penalty provisions for each offense, and it made clear that conspiracy convictions should be treated as substantive convictions at the sentencing stage.

And, more fundamentally, the government offers no reason to think that Congress ever meant for *Pinkerton* liability to govern the application of the death-or-injury enhancement in the first place, for either conspiracy or substantive convictions. *Pinkerton* is a doctrine about guilt-stage liability for a co-conspirator's substantive offenses. *See* 328 U.S. at 642, 645–47. It is not a sentencing doctrine. *See Watson*, 620 F. App'x at 509.

Thus, we are unpersuaded by the government's attempt to limit *Swiney* to sentences for § 846 conspiracy convictions. To apply the § 841(b)(1)(C) sentencing enhancement to the distribution convictions, the jury needed to find beyond a reasonable doubt that Hamm and Shields were part of the distribution chain to L.K.W. and Myers's cellmates.[10] Because Jury Instruction No. 17 did not require this finding, and because it instead allowed the jury to use *Pinkerton* liability to apply the enhancement, the instruction misstated the law.[11]

### D. Harmlessness

We review de novo claims that jury instructions misstate the law, *United States v. Lawrence*, 735 F.3d 385, 427 (6th Cir. 2013), but, with a few narrow exceptions not applicable here, we will reverse only if an error is not harmless. *See Neder v. United States*, 527 U.S. 1, 7–8, 15 (1999). In this context, an error is harmless only if "it appears 'beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained.'" *Id.* at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). In other words, an error is harmful as long as

---

[10]In future cases involving the death-or-injury enhancement, we encourage the government and district courts to consider using "separate counts, special verdict forms, or more specific instructions" to make clear to juries the distinction between substantive offenses and the death-or-injury enhancement, and the differing applicability of *Pinkerton* and *Swiney* to each. *United States v. Neuhausser*, 241 F.3d 460, 471 n.8 (6th Cir. 2001). *See generally United States v. Reed*, 147 F.3d 1178, 1180–81 (9th Cir. 1998) (collecting cases approving the use of special verdict forms when juries are "called upon to make factual determinations relevant to sentencing.").

[11]The government makes a brief attempt to argue that Instruction No. 17, read as a whole, accurately described the law even if *Swiney* applies. This argument is meritless. The instruction did not say anything about the distribution-chain rule, and it did allow the jury to apply the enhancement using *Pinkerton*. While certainly the district court bears responsibility for the accuracy of jury instructions, the government's clumsy drafting of the indictment doubtless contributed to the error.

"there is a reasonable possibility" that it "might have contributed to the" result. *Chapman*, 386 U.S. at 23 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87 (1963)). This is quite different from the sufficiency-of-the-evidence standard, so it is immaterial that we held in Part II of this opinion that there is sufficient evidence to sustain the convictions and sentencing enhancements on Counts 2 and 3.

Rather, when jury instructions misstate the law, the error is harmful "where the defendant contested" the issue that was the subject of the misstatement "and raised evidence sufficient to support a contrary finding" on that issue. *Neder*, 527 U.S. at 19. Hamm and Shields meet this standard. They argued at trial that they were not part of the distribution chain to L.K.W. and Tracey Myers's cellmates. Their theory was that Myers had other suppliers, one of whom sold her the carfentanil that caused the overdoses. While a reasonable juror did not have to accept this theory—as discussed above, there was sufficient evidence for a reasonable juror to conclude that Hamm and Shields were part of the distribution chain—there was some evidence to support it: Jennifer Hamm testified that Myers sometimes bought her drugs from her own sources instead of going through the Hamms' Cincinnati contacts. Myers also mixed her drugs with other substances; she did this in private in her room, and Jennifer Hamm never saw what substances, or in what quantities, Myers added. Finally, while Myers's carfentanil killed L.K.W., made his girlfriend unconscious, and severely injured Myers's cellmates (who would have died without prompt medical treatment), the drugs Shields sold did not cause the Hamms to overdose. And, though the friend who went to Cincinnati with the Hamms had a bad reaction to the drugs, he never lost consciousness and survived without any medical treatment. If the jury had been instructed correctly on the distribution-chain requirement, it could have found in Hamm and Shields's favor and declined to apply the death-or-injury enhancement. By contrast, the incorrect *Pinkerton* instruction allowed the jury to ignore the distribution-chain requirement— and to apply the sentencing enhancement using *Pinkerton* even if it affirmatively concluded that Hamm and Shields were *not* part of the chain of distribution.

Thus, the error was harmful, and Hamm and Shields are entitled to a new trial on the sole issue of whether to apply the § 841(b)(1)(C) death-or-injury enhancement to their convictions on Counts 2 and 3.

## V.  Conclusion

For the reasons stated above, we **AFFIRM** Hamm's and Shields's convictions, **VACATE** their sentences, and **REMAND** for a new trial on the sole question of whether to apply the 21 U.S.C. § 841(b)(1)(C) sentencing enhancement on Counts 2 and 3.